**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| THEODORE GRISWOLD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 05-CV-12147 (MLW) |
| | ) | |
| DAVID P. DRISCOLL, Commissioner of | ) | |
| Education, Massachusetts Department of | ) | |
| Education, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF** *AMICI CURIAE* **ARMENIAN BAR ASSOCIATION,**
**ARMENIAN NATIONAL COMMITTEE OF AMERICA,**
**IRISH IMMIGRATION CENTER,**
**JEWISH ALLIANCE FOR LAW & SOCIAL ACTION, AND**
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

This case is not about Plaintiffs' ability to express themselves, to receive ideas, or to

access information.  Nothing in the Massachusetts Guide to Choosing and Using Curricular

Materials on Genocide and Human Rights (the "Guide") has altered those rights.  Rather, this

case involves the Commonwealth's right as a government to express its own official views on

matters of historical importance and their place in education and to choose the specific content of

its own message.  Plaintiffs are not entitled to compel the Commonwealth to adopt others' views

as its own.

As detailed by the Attorney General, because the Guide plainly is government speech,

Plaintiffs cannot challenge it under the Free Speech Clause of the First Amendment.  *See* Defs.'

Mem. Supp. Mot. Dismiss at 9-16.  In this brief, *amici* amplify the Commonwealth's sound

position in two ways.  First, *amici* show that Chapter 276 and the Guide express the

1

Commonwealth's policy view on the commemoration of the Armenian Genocide.  This

particular expression of the Commonwealth's view follows its previous statements on the same

topic as well as those of many other governments—federal, state, and foreign.  Second, *amici*

demonstrate that under binding Supreme Court precedent, reinforced by important policy

concerns, because the Guide is government speech in support of the Commonwealth's policy of

commemorating the Armenian Genocide, Plaintiffs' claims must be rejected.  The principal

authority relied on by Plaintiffs—*Board of Educ. v. Pico*, 457 U.S. 853 (1982)—does not apply

to this case because *Pico* did not involve government speech and because there is no claim here

that any person's access to ideas or educational materials has been curtailed.  Rather, the

government speech doctrine controls this case and compels dismissal.

I.      **THE GUIDE'S RECOGNITION AND COMMEMORATION OF THE ARMENIAN GENOCIDE IS GOVERNMENT SPEECH.**

A.      **Chapter 276 And The Guide Express The Commonwealth's View That Certain Major Human Rights Violations, Among Them The Armenian Genocide, Should Be Recognized, Remembered, And Taught.**

On August 10, 1998,[1] the Massachusetts Legislature enacted Chapter 276

of the Acts of 1998, which provides in relevant part:

> The [B]oard of [E]ducation shall formulate recommendations on
> curricular material on genocide and human rights issues, and
> guidelines for the teaching of such material.  Said material and
> guidelines may include, but shall not be limited to, the period of
> the transatlantic slave trade and the middle passage, the great
> hunger period in Ireland, the Armenian [G]enocide, the
> [H]olocaust and the Mussolini fascist regime and other recognized
> human rights violations and genocides. . . . Said recommendations

---

[1] For the limited purpose of the motion to dismiss, *amici* accept as true all well-pleaded allegations in the Complaint.  *See Boston Archdiocese Teachers Ass'n v. Archdiocesan Cent. High Sch., Inc.*, 383 F. Supp. 2d 269, 273 (D. Mass. 2005).

shall be available to all school districts in the commonwealth on an
advisory basis . . . .

Ch. 276, 1998 Mass. Acts 1154 ("Chapter 276").  Chapter 276 expresses the Commonwealth's

view of the importance of teaching history to Massachusetts students in order to educate them

about these "recognized human rights violations and genocides," and directs the Board of

Education to issue guidelines setting forth materials that the Commonwealth endorses as

consistent with this view.

Pursuant to Chapter 276's express mandate, the Commonwealth's Board of Education

developed and promulgated the Guide.  *See* Compl. ¶¶ 16-31; *id.* at Ex. 17 (the Guide).[2]  The

Guide explicitly states the Commonwealth's view that Massachusetts students should be taught

history to educate them about their role and responsibilities as citizens:  "Knowing the past is a

precondition to making responsible choices in the present."  Compl. Ex. 17 at 9 (quoting the

Department of Education's History and Social Science Framework).  With respect to the history

of genocide in particular, the Guide states the following position of the Commonwealth:

> Learning about genocide in history and its persistence into the present
> day is important for today's students.  Although most students learn about the
> Nazi Holocaust, they may regard it as an isolated phenomenon, and do not learn
> that many such incidents of intentional mass killings have occurred all over the
> world and throughout history.
> . . . .
> In the study of genocide and human rights issues, students and their
> teachers confront some of the most difficult and dreadful aspects of human
> behavior: hatred, prejudice, cruelty, suffering, legalized discrimination, and mass
> murder.  The study of episodes such as the Armenian Genocide and the
> Holocaust often causes students and teachers to question why such atrocities
> occurred, whether they could occur elsewhere, and how they might be prevented.

*Id.* at 1-2.

---

[2] All references to the Complaint are to the Amended Complaint filed January 27, 2006.

To that end, and consistent with Chapter 276's requirement that the listed human rights curricular materials be "available to all school districts . . . on an advisory basis," the Guide provides a set of "recommendations for locating and selecting curriculum materials on genocide and human rights issues," Compl. Ex. 17 at 1, including a list of reference materials and websites. *See id.* at 29-36.

The Guide's recommendations are by their terms non-binding. Notwithstanding the Complaint's unsubstantiated suggestions that Plaintiffs have been subjected to "censorship" or that Lincoln-Sudbury High School students "may be denied the opportunity to receive contra-genocide viewpoints in school," Compl. ¶¶ 44, 46, Plaintiffs nowhere allege that the Commonwealth has restricted students' access to the denialist materials via the library or the Internet. The Guide is simply the Commonwealth's affirmative expression of its advisory view on how the history of human rights should be taught. It does not require anyone to study, let alone agree with, that view or to accept the Commonwealth's endorsement of particular resource materials.

The Guide—like Chapter 276—expresses the Commonwealth's recognition of certain genocides and other human rights violations, the Commonwealth's view that they should be remembered and taught, and the Commonwealth's recommendation of particular reference materials for that purpose. The Commonwealth does not endorse, either in Chapter 276 or the Guide, materials that deny the occurrence of the Armenian Genocide. Doing so would undermine the Commonwealth's stated message in the Guide that genocides have occurred in the past and should be studied to understand "why such atrocities occurred, whether they could occur elsewhere, and how they might be prevented." Compl. Ex. 17 at 3.

**B.      Numerous Other Governments, Including The United States, Most State Governments, And Multiple International And Foreign Assemblies, Have Made Similar Official Statements Recognizing The Armenian Genocide And Its Historical Importance.**

A substantial body of government speech exists recognizing and commemorating the Armenian Genocide.  Chapter 276 and the Guide are to be understood in the context of this widespread official acknowledgment of the importance of this tragic event.

The United States' recognition of the atrocities visited on the Armenians in World War I dates back to the era of the Armenian Genocide itself.  After a series of hearings, the U.S. Senate in 1920 announced that "the testimony adduced at the hearings conducted by the subcommittee of the Senate Committee on Foreign Relations ha[s] clearly established the truth of the reported massacres and other atrocities from which the Armenian people have suffered."  S. Res. 359, 66th Cong. (1920).  Months later, the United States entered into a peace treaty with the Turkish government that recognized "the wrongs inflicted on individuals in the course of the massacres perpetrated in Turkey during the war."  Treaty of Peace Between the Allied and Associated Powers and Turkey, Signed at Sevres, Sen. Doc. No. 7, 67th Cong., 2d Sess. (Aug. 10, 1920) (never ratified).  In the post-World War II era, following the coining of the term "genocide" by Raphael Lemkin,[3] the United States Congress has periodically re-emphasized its recognition of the Armenian Genocide and referred to it by that name.  *See, e.g.*, H.J. Res. 247, 98th Cong., (1984) ("April 24, 1985, is hereby designated as 'National Day of Remembrance of Man's Inhumanity to Man', and the President of the United States is authorized and requested to issue a

---

[3] *See* William Korey, *Raphael Lemkin:"The Unofficial Man,*" Midstream, June/July 1989 , at 45, 45-48 (describing Lemkin's work and the coining of the term "genocide"); Raphael Lemkin, *Axis Rule in Occupied Europe: Laws of Occupation - Analysis of Government - Proposals for Redress* xi (1944) (coining the term). *See also* Convention on the Prevention and Punishment of the Crime of Genocide*,* Dec. 9, 1948, 78 U.N.T.S. 277.

proclamation calling upon the people of the United States to observe such day as a day of remembrance for all victims of genocide, especially the one and one-half million people of Armenian ancestry who were the victims of the genocide perpetrated in Turkey between 1915 and 1923 . . . . "); H.J. Res. 148, 94th Cong. (1975) (urging "a day of remembrance for all victims of genocide, especially those of Armenian ancestry who succumbed to the genocide perpetrated in 1915").

At least thirty-seven states have by legislative resolution or gubernatorial declaration (or in many cases both) also expressed the official view that the Armenian Genocide should be recognized and commemorated.[4]  Massachusetts itself issued such statements even prior to the

_____

[4]*See, e.g.*, Legis. Resolve No. 13, Source SR-20 (Alaska 1990) ("[T]he Armenian Genocide . . . was conceived by the Turkish government and implemented from 1915 to 1923 . . . ."); Gubernatorial Proclamation (Alaska Apr. 19, 1990) ("[F]rom 1915 to 1923, the Turkish government committed genocide against the Armenian people . . . ."); Gubernatorial Proclamation (Ariz. Apr. 23, 1990) ("[B]eginning April 24, 1915, the Armenian people suffered a genocide of great proportion . . . ."); Gubernatorial Proclamation (Ark. Mar. 27, 2001) (proclaiming "A Day of Remembrance of the Armenian Genocide"); Assemb. J. Res. 44, 2001-02 Reg. Sess. (Cal. 2002) (designating "California Day of Remembrance for the Armenian Genocide of 1915-1923"); S.J. Res. 1, 2003-04 Reg. Sess. (Cal. 2003) (same); Cal. Gov't Code § 6720 (2005) (establishes April 24 of each year as the California Day of Remembrance of the Armenian Genocide); Gubernatorial Proclamation (Cal. Apr. 22, 2004) (proclaiming same); H.J. Res. 1049, 64th Gen. Assemb., 1st Reg. Se ss. (Colo. 2003) (designating "Colorado Day of Remembrance of the Armenian Genocide"); S.J. Res. 22, 63d Gen. Assemb., 2d Reg. Sess. (Colo. 2002) (same); Gubernatorial Proclamation (Colo. Mar. 14, 1990) (proclaiming "Armenian Martyrs Day" and stating that "on Apr. 24, 1915, the Ottoman Turks arrested and killed 250 Armenian community leaders and intellectuals, an act which signaled the genocide that was to follow . . . .  [T]he Turks then massacred 1.5 million Armenians and drove many million [sic] more into exile from their ancestral homeland . . . ."); Gubernatorial Proclamation (Conn. Apr. 24, 2001) (proclaiming "A Day of Remembrance for the Armenian Genocide"); Sen. Con. Res. No. 19, 138th Gen. Assemb. (Del. 1995) ("A Day of Remembrance of 'Man's Inhumanity to Man' for the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Fla. Apr. 27, 1990) (commemorating the "75th anniversary of the Armenian Genocide"); S. Res. 118, 145th Gen. Assemb., 1999-00 Reg. Sess. (Ga. 1999) (proclaiming "Georgia Day of Remembrance of the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Idaho Apr. 20, 2004) (same); H. Res. 113, 90th Gen. Assemb., 1997-98 Reg. Sess. (Ill. 1997) (calling for "a day of remembrance in honor of the victims of the Armenian Genoc ide"); S. Res. 50, 89th Gen. Assemb., 1995-96 Reg. Sess. (Ill. 1995) ("a Day of Remembrance of the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Ill. Apr. 27, 2000) ("[Eighty-five] years ago Armenians were forced to witness the genocide of their relatives . . . ."); 105 Ill. Comp. Stat. 5/27-20.3 (2005) (mandating the teaching of the Armenian Genocide, in addition to other 20th century genocides, in public schools);

Gubernatorial Declaration (Kan. Apr. 20, 2005) ("[T]oday marks the ninetieth anniversary of the genocide and deportations of countless Armenians in Ottoman Turkey . . . ."); Gubernatorial Proclamation (La. Apr. 18, 2004) (proclaiming "Day of Rememberance [sic] of the Armenian Genocide of 1915-1923"); H.B. 1373, 120th Leg., 1st Reg. Sess. (Me. 2001) ("We . . . pause in solemn memory of the victims of the Armenian Genocide of 1915 to 1923 and urge one and all to express our common desire to continually strive to overcome prejudice and inhumanity through education . . . ."); H.J. Res. 3, 415th Gen. Assemb., 2001 Reg. Sess. (Md. 2001) (designating "Maryland Day of Remembrance of the Armenian Genocide in 1915 and thereafter"); Gubernatorial Proclamation (Md. Apr. 24, 1990) (proclaiming "Day of Remembrance of the Armenian Genocide—75th Anniversary Day"); H. Res. 74, 90th Leg., 1999 Reg. Sess. (Mich. 1999) ("[W]e observe the 84th Commemoration of the Armenian Genocide . . . ."); S. Res. 44, 90th Leg., 1999 Reg. Sess. (Mich. 1999) (same); Gubernatorial Proclamation (Minn. Mar. 16, 2001) ("The Armenian Genocide was conceived and carried out by the Ottoman Empire from 1915 to 1923 . . . ."); H. Con. Res. 4, 91st Gen. Assemb., 2nd Reg. Sess. (Mo. 2002) (declaring "Day of Remembrance of the Armenian Genocide"); Letter from Mont. Governor to Armenian Nat'l Comm. of Am. (Apr. 2004) (recognizing "[t]he Armenian [G]enocide"); Gubernatorial Proclamation (Neb. Apr. 23, 2004) (proclaiming "Day of Remembrance of the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Nev. Apr. 11, 2000) (stating that the "systematic and deliberate massacre of the Armenian people between 1915-1923 represents the first Genocide of the 20th Century"); S. Res. 7, 1990 Sess. (N.H. 1990) ("[One million five hundred thousand] people of Armenian ancestry were victims of genocide perpetrated by the governments of the Ottoman Empire from 1915 to 1923 . . . ."); Gubernatorial Proclamation (N.J. Mar. 15, 2004) ("[I]t is appropriate that we . . . commemorate the memory of the victims, in hopes that we, as a State and as individual citizens, will strive to overcome prejudice, hatred and indifference through learning, tolerance and remembrance . . . ."); H.J. Mem'l 117, 46th Leg., 1st Sess. 2003 (N.M. 2003) (calling for task force to study need for increased funding for the state's Holocaust and Intolerance Museum, which has exhibits recognizing "the Armenian genocide" and other human rights violations); State Legis. Res. J4589 (N.Y. 2002) (calling for "pause in . . . deliberations to commemorate the 87th Anniversary of the Armenian Genocide"); S. Legis. Res. 810 (N.Y. 1986) ("Resolved, [t]hat this Legislative Body pause in its deliberations . . . and [be] mindful of the presidential statements which reflect an American policy of recognition of the Armenian genocide . . . ."); Gubernatorial Proclamation (N.Y. Apr. 24, 2004) (recognizing "Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (N.C. Apr. 23, 1999) (proclaiming "A Day of Remembrance of the Armenian Genocide"); S. Con. Res. 68 (Okla. 1990) (commemorating "the 75th anniversary of the Armenian Genocide"); Gubernatorial Proclamation (Or. Apr. 23, 1990) ("Beginning in 1915, the Ottoman Empire initiated a . . . systematic program of genocide . . . to eliminate the Armenian race . . . ."); H. Res. 593, 2004 Sess. (Pa. 2004) (designating "Pennsylvania's Day of Remembrance of the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Pa. Apr. 19, 1990) ("All told, more than half of the Armenian population of the [Ottoman] Empire perished in this, the first genocide of the 20th century . . . ."); H.B. 6336, 2003-2004 Legis. Sess. (R.I. 2003) (proclaiming "Rhode Island Day of Remembrance of the Armenian Genocide"); S.B. 2958, 2001-2002 Legis. Sess. (R.I. 2002) (same); Gubernatorial Proclamation (R.I. June 29, 1990) ("[Seventy-five] years ago, . . . Armenians were massacred in an attempt by Ottoman Turkey to exterminate the Armenian race . . . ."); R.I. Gen. Laws § 16-22-22 (2005) (requiring that the department of elementary and secondary education develop a curriculum to teach about genocide, including the Armenian Genocide); H.B. 3678, Gen. Assemb., 113th Sess. (S.C. 1999) (proclaiming "South Carolina Day of Remembrance of the Armenian Genocide of 1915-1923"); Gubernatorial Proclamation (Tenn. Apr. 23, 2004) (proclaiming a day of recognition for "Remembrance of the Armenian Genocide"); Gubernatorial Proclamation (Utah Apr. 2001) ("[U]nderstanding the plight of the Armenian genocide, and educating the public, is [sic] one step toward eliminating possible future genocides . . . ."); Gubernatorial Proclamation

passage of Chapter 276. *See, e.g.,* S.J. Res. of April 19, 1990, Mass. Gen. Ct., "On the Occasion

of a Day of Remembrance for the Armenian Genocide of 1915-1923" (Mass. 1990);

Gubernatorial Proclamation (Mass. Mar. 23, 1990) ("Since 1915, April 24th of every year has

been imprinted in the memory of the Armenian people worldwide.  It was then that the mass

genocide of the Armenian people began in the Ottoman Turkish Empire . . . Our prayers . . . will

serve to remind governments of the world that persecution, torture, and killing must cease

forever"); Mass. Gen. Laws ch. 6, § 15II (1978) ("The governor shall annually issue a

proclamation setting apart the twenty- fourth day of April as Armenian Martyrs' Day, and

recommending that said day be observed in an appropriate manner by the people.").

Recognition of the Armenian Genocide has been similarly widespread abroad.  The

European Parliament has declared that "the tragic events in 1915-1917 involving the Armenians

living in the territory of the Ottoman Empire constitute genocide within the meaning of the

convention on the prevention and the punishment of the crime of genocide adopted by the UN

General Assembly on 9 December 1948."  *Report of the Political Affairs Committee on a*

*Political Solution to the Armenian Question*, Eur. Parl. Doc. A2-33/87 (Apr. 15, 1987).  In the

past decade, the European Parliament has repeatedly reaffirmed this conclusion.[5]  The United

---

(Vt. Apr. 24, 2004) (recognizing 89th anniversary of "the mass genocide of the Armenian people . . . in
the Ottoman Turkish Empire"); H.J. Res. 298 (Va. 2000) (recognizing that "one and one-half million men
women and children of Armenian descent were victims of the brutal genocide perpetuated by the Turkish
Ottoman Empire from 1915 to 1923"); Gubernatorial Certificate of Recognition (Va. Apr. 24, 2002)
("[A]t least 1,500,000 people of Armenian ancestry were victims of Genocide perpetrated by the
governments of the Ottoman Empire from 1915-1923 . . . ."); Gubernatorial Proclamation (Wash. Apr. 20,
1990) (issued "in recognition of the 75th anniversary of the Armenian Genocide"); S. Res. 14, 95th Legis.
Sess., 2001-02 Reg. Sess. (Wisc. 2002) (designating "Wisconsin Day of Remembrance for the Armenian
Genocide of 1915 to 1923").

[5] *See, e.g.,* Council of Eur. Parl. Assemb. Doc. 9056, Written Decl. No. 320 (Apr. 24, 2001)
("Commemorating today the anniversary of the first genocide of the 20th century – the Armenian
genocide – and paying tribute to the memory of its victims"); Council of Eur. Parl. Assemb. Doc. 8091,
Written Decl. No. 275 (Apr. 24, 1998) ("Commemoration of the Armenian genocide of 1915").

Nations Commission on Human Rights has also recognized the genocide.[6]  Numerous individual

foreign governments have recognized the Armenian Genocide as well, including Argentina,[7]

Australia,[8] Belgium,[9] Canada,[10] Cyprus,[11] France,[12] Greece,[13] Lebanon,[14] Russia,[15] Sweden,[16]

Switzerland,[17] and Uruguay.[18]

---

Individual members of the parliament have continued to recognize the seriousness of this issue. *See also, e.g.,* Miquel Mayol i Raynal, Member of Eur. Parl., Written Question to the Comm'n E-2038/03, 2004 O.J. (C 51 E) 184 (June 19, 2003) ("[T]he Turkish government . . . has launched a counter-information campaign to refute the accusations of genocide against the Armenian people. . . .  The policy of denying the genocide is . . . incompatible with the European values of protection of human rights and minority rights . . . .").

[6] In August 1985, the U.N. Sub-Commission on Prevention of Discrimination and Protection of Minorities of the Commission on Human Rights took note, by a 14-1 vote (with 4 abstentions), of the historical fact of the Armenian genocide. *See* U.N. ESCOR, 38th Sess., 36th mtg. at 7, U.N. Doc. E/CN.4/Sub.2/1985/SR.36 (1985).  Its parent body, the U.N. Commission on Human Rights, followed suit. *See Revised and Updated Report on the Question of the Prevention and Punishment of the Crime of Genocide*, U.N. ESCOR, 38th Sess. (Prov. Agenda Item 4), at 8-9, U.N. Doc. E/CN.4/Sub.2/1985/6 (July 2, 1985), and as revised, U.N. Doc. E/CN.4/Sub.2/1985/6/Corr.1 (Aug. 29, 1985).

[7] *See, e.g.*, Proyecto de Declaración [S. Decl.] 664/03 (Aug. 20, 2003) (Arg.) ("With deep sorrow we commemorate the 88th anniversary of the genocide of 1.5 million Armenians, perpetrated by the Turkish State between the years 1915 and 1923.").

[8] *See, e.g.,* N.S.W. Parl. Res. of Apr. 17, 1997 (Austl.) ("[The Twenty-fourth of] April 1997 marks the occasion of the 82nd anniversary of the commemoration of the Genocide of the Armenians by the then Ottoman Turkish Government between 1915-1922 . . . .").

[9] *See* S. Res. 1-736/3, 1997-1998 Sess. (Mar. 26, 1998) (Belg.) ("The Senate . . . [r]equests the Turkish government to recognize the historic reality of the genocide committed in 1915 by the last government of the Ottoman Empire . . . .").

[10] *See, e.g.*, H.C. Res., Private Members' Bus. M-380 (Apr. 21, 2004) (Can.) (affirming a resolution that "this House acknowledge the Armenian genocide of 1915 and condemn this act as a crime against humanity").

[11] *See* H.R. Res. of Apr. 29, 1982 (Cyprus) ("[o]n the occasion of the Anniversary of the genocide of the Armenian people which was started in 1915 in an organized manner by the then Turkish regime").

[12] *See* Loi no. 2001-70 de L'Assemblée nationale et le Sénat [Nat'l Assemb. and S.L. No. 2001-70], J.O. 1590 (Jan. 29, 2001) (Fr.) ("France publicly recognizes the Armenian Genocide of 1915.").

[13] *See* Hellenic Parl. Res. 2397/1996 (Apr. 25, 1996) (Greece) ("The 24th of April is established as the day of commemoration of the genocide of Armenians by Turkey.").

Thus, numerous governments—federal, state, and foreign—have made official statements recognizing the Armenian Genocide and its historical importance that parallel those made by the Commonwealth of Massachusetts.  Chapter 276 and the Guide differ from these statements only in that they express the Commonwealth's additional views that the Armenian Genocide should be taught in schools and that certain specified materials are consonant with that view.  In passing Chapter 276 in 1998 and in promulgating the Guide in 1999, the Commonwealth followed in the footsteps of its own and many other governments' pronouncements recognizing and commemorating the genocide.

## II.     BECAUSE THE GUIDE IS GOVERNMENT SPEECH, THE GOVERNMENT SPEECH DOCTRINE COMPELS DISMISSAL OF THE COMPLAINT.

### A.     The Free Speech Clause Permits The Commonwealth To Make Content-Based Choices When It Chooses To Speak About Historic Tragedies In Chapter 276, The Guide, And Elsewhere.

The Free Speech Clause of the First Amendment places no restraints on what messages the government may convey.  The First Amendment provides that "Congress shall make no law .

---

[14] *See* Chamber of Deputies Parl. Res. of May 11, 2000 (Leb.) ("[Th]e Lebanese Chamber of Deputies recognizes and condemns the genocide perpetrated against the Armenian people . . . .  Furthermore, it believes that the international recognition of this genocide is a necessary condition for the prevention of similar crimes that may occur in the future.").

[15] *See* State Duma Res. of Apr. 14, 1995, Fed. Assemb. of Russian Fed'n (Russ.) ("[The Duma] [c]ondemns the perpetrators of the extermination of Armenians from 1915 to 1922 . . . and recognizes April 24 as a day of remembrance for the victims of the Genocide.").

[16] *See* Res. of Parl. Standing Comm. on Foreign Affairs of Mar. 29, 2000, reported by For. Ministry (Swed.) ("An official statement and recognition of the Genocide of the Armenians is important and necessary.").

[17] *See* Nat'l Council Res. 02.3069 (Dec. 16, 2003) (Switz.) ("*Le Conseil national reconnaît le génocide des Arméniens de 1915.*" [The National Council recognizes the Armenian genocide of 1915.]).

[18] *See* S. & H.R. Bill No. 17.752 (Mar. 26, 2004) (Uru.) ("The day of April 24 is declared as the 'Day of Recognition for the Armenian Martyrs' in homage to the victims of this national massacre in 1915.").

. . abridging the freedom of speech."  U.S. Const. amend. I.  Under the Free Speech Clause, "a speaker has the autonomy to choose the content of his own message."  *Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 573 (1995).  As the Supreme Court's government speech cases have recognized, in matters other than religion, "when the State is the speaker, it may make content-based choices."[19]  *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 833 (1995); s*ee also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) ("viewpoint-based funding decisions can be sustained in instances in which the government itself is the speaker"); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580-587 (1998) (sustaining against a facial Free Speech Clause challenge a statute requiring the NEA to ensure that artistic excellence and artistic merit are criteria by which grant applications are judged, taking into consideration general standards of "decency and respect" for diverse beliefs and values of the American public); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (Congress may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").  "[T]he government [can] regulate the content of what is or," as is the issue in this case, "what is *not* expressed when it is the speaker."  *Rosenberger,* 515 U.S. at 833 (emphasis added).

A person displeased by the content of government speech is typically not entitled to judicial relief, even where the speech is "offensive[]" to that person.  *NAACP v. Hunt*, 891 F.2d 1555, 1564-1565 (11th Cir. 1990).  Rather, "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the

---

[19] Although the Establishment Clause mandates neutrality in matters of religious expression, that clause is irrelevant to this case, as neither Chapter 276 nor the Guide conveys any religious message.

electorate and the political process for its advocacy.  If the citizenry objects, newly elected

officials later could espouse some different or contrary position."  *Board of Regents v.*

*Southworth,* 529 U.S. 217, 235 (2000); *see also Griffin v. Secretary of Veterans Affairs*, 288 F.3d

1309, 1324-1325 (Fed. Cir. 2002) ("The government is entitled to full control over its own

speech, whether it speaks with its own voice or enlists private parties to convey its message, and

the remedy for dissatisfaction with its choices is political rather than judicial.").

The rationale behind this established doctrine is simply that "[i]f the government cannot

address controversial topics it cannot govern."  *Miller v. California Comm'n on the Status of*

*Women*, 198 Cal. Rptr. 877, 882 (Cal. Ct. App. 1984).  The Court of Appeals has recognized that

"the state plays an important role as a participant in the marketplace of ideas.  It can speak

directly, encouraging certain activities . . . while discouraging others."  *Student Gov't Ass'n v.*

*Board of Trs.*, 868 F.2d 473, 482 (1st Cir. 1989) (citations omitted).  Indeed, state governments

regularly advocate a wide array of activities, products, and ideas:  they "promote tourism,

attempt to attract business investment, and advertise the state's most important products . . . .

[even] when they maintain schools, colleges, libraries, auditoriums, museums, and public

broadcasting stations, and whenever public officials give speeches or hold press conferences."

Frederick Schauer, *Is Government Speech a Problem?*, 35 Stan. L. Rev. 373, 373-374 (1983)

(reviewing Mark G. Yudof, When Government Speaks: Politics, Law, and Government

Expression in America (1983)).

Consistent with the importance of government being able to express its viewpoint as part

of exercising these functions, "courts consider government communication to be a function of

the state that is not constrained by the limitations of the first amendment."  *Id.* at 375-376.  In

this regard, neutrality is not possible or desirable.  *See, e.g., Finley*, 524 U.S. at 598 (Scalia, J.,

concurring) (noting that it "is the very business of government to favor and disfavor points of

view on (in modern times, at least) innumerable subjects").  Courts have construed the Free

Speech Clause in light of an understood social compact under which citizens "have agreed to

elect individuals to official posts who will, and must, speak and act on behalf of the entire

population, including on behalf of those who disagree with all or some of the government's

programs." *United States v. Frame,* 885 F.2d 1119, 1131 (3d Cir. 1989).[20]

Here, the Commonwealth has spoken:  the Guide is "'the Government's own speech.'"

Defs.' Mem. Supp. Mot. Dismiss at 15 (quoting *Johanns v. Livestock Mktg. Ass'n*, 125 S. Ct.

2055, 2058 (2005) (which, in turn, held government-controlled advertising "exempt from First

Amendment scrutiny")).  Plaintiffs have not attempted to rebut that proposition, nor could they.

Because the Guide is a Commonwealth-authored document—the "message" of which is

"controlled by" the Commonwealth's Board of Education—it is government speech for the

purpose of Free Speech Clause analysis.  *See Johanns*, 125 S. Ct. at 2062.

Specifically, through a set of policies—including legislative resolutions, Chapter 276 and

the Guide—Massachusetts, like many other governments, has chosen to commemorate the

Armenian Genocide.  "To commemorate is to take a stand, to declare the reality of heroes (or

heroic events) worthy of emulation or, less frequently, that an event that occurred at a particular

place was indeed so terrible that it must be remembered forever after as a cautionary note."

Sanford Levinson, *Written In Stone: Public Monuments in Changing Societies* 137 (1998).  The

commemorative function lies at the core of government's use of speech to transmit expressive

---

[20] *See also, e.g.*, Will Kymlicka, *Multicultural Citizenship: A Liberal Theory of Minority Rights* (1995)
("Governmental decisions on languages . . . , public holidays, and state symbols unavoidably involve
recognizing, accommodating, and supporting the needs and identities of particular ethnic and national
groups.  The state unavoidably promotes certain cultural identities, and thereby disadvantages others."),
*quoted in* Sanford Levinson, *Written in Stone: Public Monuments in Changing Societies* 85 (1998).

messages, which may include "the full set of political doctrines, historical narratives, exemplary

figures, celebratory occasions, and memorial rituals through which the state impresses itself on

the minds of its members."[21]

In selecting those events or ideas that they will celebrate, commemorate, or endorse,

governments in the United States are not required to give equal recognition to opposite or even

different points of view.  Without this basic freedom to choose the content of their official

messages, governments would lose the ability to express views on the importance of various

historical events.  For example, the City of Boston has chosen to display monuments that

commemorate several events identified by Chapter 276 as "recognized human rights violations

and genocides":

- The Soldiers' and Sailors' monument on Boston Common states: "To the Men of

  Boston/Who Died for their country/On Land and Sea in the War/Which Kept the Union

  Whole/Destroyed Slavery/And Maintained the Constitution/The Grateful City Has Built

  this Monument/That Their Example May Speak to Coming Generations";[22]

- The 54th Regiment Memorial on Boston Common near the corner of Beacon and Park

  Streets celebrates the first African-American regiment in the Civil War.  It is inscribed:

  > To The Fifty Fourth / Regiment Of Massachusetts Infantry /
  > The White Officers / Taking Life And Honor In Their Hands / Cast In
  > Their Lot With Men Of A Despised Race Unproved In War And Risked
  > Death As Inciters Of Servile Insurrection If Taken Prisoners / Besides
  > Encountering All The Common Perils Of Camp March And Battle / The
  > Black Rank And File Volunteered When Disaster Clouded The Union
  > Cause / Served Without Pay For Eighteen Months Till Given That Of

---

[21] Michael Walzer, *On Toleration* 76 (1997).

[22] *See* Levinson, *supra*, at 57 (photograph of the monument).

> White Troops / Faced Threatened Enslavement If Captured / Were Brave
> In Action / Patient Under Heavy And Dangerous Labors / And Cheerful
> Amid Hardships And Privations / Together / They Gave To The Nation
> And The World Undying Proof That Americans Of African Descent
> Possess The Pride Courage And Devotion Of The Patriot Soldier / One
> Hundred And Eighty Thousand Such Americans Enlisted Under The
> Union Flag In MDCCCLXIII - MDCCCLXV;

- The Irish Famine Memorial monument stands at the corner of Washington and School Streets in downtown Boston;

- The Boston National Historic Park maintains the site housing the New England Holocaust Memorial.  *See* http://www.nehm.com/intro.html.

Boston, while displaying these monuments, is not required to erect monuments to other human rights violations that many may consider no less worthy of commemoration, such as the genocide in Rwanda, the massacre of Bosnian Muslims at Srebrenica, or the millions of deaths caused by Joseph Stalin or Mao Zedong.  Boston certainly is not required to match its remembrance of fallen Union troops and Holocaust victims with governmentally-endorsed memorials to the Confederacy and the Third Reich.  The city government's decision to recognize and remember particular historical events is identical in character to the official views expressed by the Commonwealth in the Guide.  In the Guide, as in a monument, the Commonwealth has the governmental authority to determine what messages it does and does not express.  *See Rosenberger*, 515 U.S. at 833.  *A fortiori*, the Commonwealth may decline to adopt, as its own, speech that, if adopted, would undercut its stated chosen message:  promoting lessons as to the Armenian Genocide regarding—not whether— but "*why* such atrocities occurred . . . and how they might be prevented."  Compl. Ex. 17 at 3 (emphasis added).

15

B.      ***Pico*** **Does Not Apply To This Case Because** ***Pico*** **Does Not Involve Government Speech And Because Plaintiffs' Access To Materials Has Not Been Curtailed.**

Plaintiffs' near-exclusive reliance on the plurality opinion in *Board of Educ. v. Pico*, 457 U.S. 853 (1982), is misplaced for many reasons, not least of which is that *Pico* was not a case of government speech.  For this reason alone, *Pico* is inapposite.  Moreover, *Pico* is clearly distinguishable because the plaintiffs' access to ideas and educational materials in that case was restricted.  Here, in contrast, Plaintiffs do not—and cannot—allege that the Commonwealth has in any way restricted their access to ideas or educational materials.

In *Pico,* school board officials removed books from the library because "passages in the books [allegedly] offended . . . social, political and moral tastes."  *Id.* at 859 (citation omitted).  The Court's plurality held that "'the State may not, consistently with the spirit of the First Amendment, ***contract*** the spectrum of available knowledge.'"  *Id.* at 866 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)) (emphasis added).  Because the school officials—via removal of the books—had contracted the spectrum of students' available knowledge and access to ideas, the Court turned to the question of whether the school officials' decision was animated by improper motives.  *See id.* at 872-875.  And because the facts in *Pico* did not "foreclose the possibility" that the school officials' decision to remove the books was based on improper motives, the plurality concluded that summary judgment for the school officials could not be granted.  *Id.* at 875.

Plaintiffs incorrectly focus exclusively on the second part of *Pico*'s analysis (the school officials' motivation) while ignoring the first part (restricted access).  However, under *Pico's* analytic framework, the reasons behind a decision to remove access to certain materials are not relevant unless and until it has been shown, as a predicate matter, that access has been restricted.

No Free Speech Clause claim can exist in the absence of a restriction—whatever motivations may or may not be at play.

Here, the Complaint, although strident about Defendants' alleged motivations, is completely and fatally silent concerning any restriction of access.  The Complaint nowhere alleges that the Commonwealth has decreased access to ideas or materials in any respect.  It does not allege that the Commonwealth has placed any restrictions on any person viewing or researching the denialist websites at issue.  Nor does it allege that teachers are restricted from teaching denialist materials or that students are restricted from discussing denialist assertions.  In vivid contrast to the facts alleged in *Pico*, where the library books at issue had been removed from the shelves, the websites in controversy in this case are just as freely available on the Internet today as they were before the publication of the Guide.

Because the Complaint does not allege any suppression of *access* to ideas, *Pico* is irrelevant to this case.  Rather, as *amici* have demonstrated, the government speech doctrine controls—and mandates dismissal—because the Guide is the Commonwealth's expression of its recognition and commemoration of the Armenian Genocide.

## CONCLUSION

Plaintiffs remain free to ignore the Guide's recommended resources, to read materials that express contrary views, and to express such views themselves, just as they may walk by the Holocaust Memorial, read books that side with the Confederacy, or deny the relevance of the Irish Famine to our national heritage.  But they cannot force the Commonwealth of Massachusetts to endorse *their* views as its own.  "[W]hen the State is the speaker, it may make content-based choices."  *Rosenberger*, 515 U.S. at 833.  Here, the Commonwealth has, like many other jurisdictions, made a content-based choice to recognize the Armenian Genocide.  The

17

Commonwealth is fully entitled to decline to include in its list of state-endorsed materials

sources that deny that the Armenian Genocide occurred.  Because the Guide is government

speech, the Commonwealth's motion to dismiss for failure to state a claim should be granted.

Respectfully submitted,

ARMENIAN BAR ASSOCIATION

By its attorneys,


_/s/ Gabrielle R. Wolohojian_____
Gabrielle R. Wolohojian (BBO #555704)
Mark C. Fleming (BBO #639358)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Ariel B. Waldman
WILMER CUTLER PICKERING HALE AND DORR LLP
2445 M Street NW
Washington, D.C.  20037
(202) 663-6000


ARMENIAN NATIONAL COMMITTEE OF AMERICA,
IRISH IMMIGRATION CENTER,
JEWISH ALLIANCE FOR LAW & SOCIAL ACTION,
AND NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE

By their attorney,


 /s/ Edward J. Barshak            _____
Edward J. Barshak (BBO #032040)
SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
101 Merrimac Street
Boston, MA  02114-4737
617-227-3030

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served upon the

following persons on the 8th day of March 2006 through the Court's electronic filing system.

> Harvey A. Silverglate, Esq.
> 607 Franklin Street
> Cambridge, MA  02139
>
> Malick W. Ghachem, Esq.
> Norman S. Zalkind, Esq.
> Zalkind, Rodriguez, Lunt & Duncan
> 65a Atlantic Ave.
> Boston, MA  02110
>
> Philip G. Cormier, Esq.
> Good & Cormier
> 83 Atlantic Ave.
> 3rd Fl.
> Boston, MA  02110
>
> William W. Porter, Esq.
> Attorney General's Office
> One Ashburton Place
> Room 2019
> Boston, MA  02108

>  /s/ Mark C. Fleming _____
> Mark C. Fleming