UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____
                                        )
THEODORE GRISWOLD, AND HIS PARENT       )
AND NEXT FRIEND,  THOMAS GRISWOLD,      )
                                        )
JENNIFER WRIGHT, AND HER PARENT         )
AND NEXT FRIEND, RAYMOND WRIGHT,        )
                                        )
DANIEL GLANZ, AND HIS PARENT AND        )
NEXT FRIEND, RICHARD GLANZ,             )
                                        )
WILLIAM SCHECHTER,                      )
                                        )
LAWRENCE AARONSON, AND                  )
                                        )
ASSEMBLY OF TURKISH AMERICAN            )
ASSOCIATIONS,                           )
                                        )    Docket No. 05-MLW-12147
                 Plaintiffs,            )
                                        )
            v.                          )
                                        )
DAVID P. DRISCOLL, COMMISSIONER OF      )
EDUCATION, MASSACHUSETTS                )
DEPARTMENT OF EDUCATION, IN HIS         )
OFFICIAL CAPACITY,                      )
                                        )
JAMES A. PEYSER,                        )
CHAIRMAN, MASSACHUSETTS BOARD OF        )
EDUCATION, IN HIS OFFICIAL CAPACITY,    )
                                        )
THE DEPARTMENT OF EDUCATION FOR         )
THE COMMONWEALTH OF                     )
MASSACHUSETTS, AND                      )

|  |  |
|---|---|
| THE MASSACHUSETTS BOARD OF EDUCATION, | ) ) ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

### I. INTRODUCTION AND OVERVIEW

This action is brought in the spirit of Justice Oliver Wendell Holmes' belief that the best test of truth is the ability of thought to prevail in the free marketplace of ideas.[1]  The Plaintiffs include public-school students and their fathers, public-school teachers, and an umbrella group of Turkish-American citizen associations.  They maintain that the Massachusetts Department of Education and Board of Education, having deemed certain materials educationally suitable for inclusion in the final version of a state guide to recommended materials for the study of human rights and genocide issues, later excised those materials from the guide under political pressure from the governor of the Commonwealth, a state senator, and lobbying groups.  The Plaintiffs further maintain that the deletion of these materials because of political hostility towards the viewpoints expressed in them, and not because of concerns about their educational suitability, violated the Plaintiffs' rights to free expression and belief guaranteed by the United States

---

[1] *Abrams v. United States*, 250 U.S. 616 (1919).

Constitution.[2]

Two characteristics of the materials excised by the Defendants are important to this lawsuit. First, the excised materials, along with materials expressing viewpoints contrary to them, were approved by the Commonwealth's own educational experts for inclusion in the guide at issue. Second, as incorporated into that guide, the excised materials functioned in much the same manner as, and hence are analytically and legally indistinguishable from, school library books and other auxiliary, non-mandatory educational resources.[3] The excision of these materials was occasioned by demands from prominent politicians as well as Armenian-American organizations who contend that the fate of the Ottoman Armenians during the World War One-era was the result of genocide – a crime defined by the 1948 United Nations Convention on the Prevention and Punishment of the Crime of Genocide. For purposes of the below complaint – which does not take a position on the fate of the Ottoman Armenians, and does not ask this Court to do so either – this view is denoted in shorthand as "the genocide thesis." It has been advanced by such scholars as Vahakn Dadrian, Peter Balakian, Richard Hovannisian, and others.

In March 1999, as required by Chapter 276 of the Massachusetts Session Laws of 1998, the Department and Board submitted "The Massachusetts Guide to Choosing and Using Curricular Materials on Genocide and Human Rights Issues" ("the Guide") to the Massachusetts Legislature. The Guide marked the culmination of an administrative process that involved public comment and the educational vetting of proposed materials. The Guide stated that

---

[2] These rights to free expression and belief, protected under the First Amendment, are cited in the guide at issue in its list of "Human Rights in the Founding Documents of the United States." See Exhibit 17 (Appendix A).

[3] *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982).

instructional materials related to genocide and human rights issues should provide "differing points of view on controversial issues." <u>See</u> Exhibit 8 at 22. In keeping with this directive, the Guide contained references to resource materials that presented not only the genocide thesis, but also contained viewpoints contending that the fate of the Ottoman Armenians did not reflect a policy of genocide on the part of Ottoman authorities. These viewpoints contend instead that the fate of the Ottoman Armenians was the result of a number of factors, including the Ottoman government's response to an Armenian revolt in alliance with Russia, a tragically flawed deportation policy, and mutual wartime massacres, which brought great suffering and death to both Ottoman Armenians and Muslims ("the contra-genocide thesis"). The contra-genocide thesis has been advanced in different forms by different scholars, such as Bernard Lewis, Guenter Lewy, and Justin McCarthy. This thesis does not maintain that the Ottoman Armenians did not suffer terribly, but holds rather that they did not suffer alone and that their experience does not amount to the crime of genocide. The resource materials for both of these divergent theses were found by the Defendants to be educationally suitable for inclusion in the Guide submitted to the Legislature.

Shortly after the Guide's legislative submission in March 1999, the Defendants capitulated to the pressure of prominent politicians and Armenian-American interest groups. The Defendants purged the Guide of all references to contra-genocide source materials and promulgated an expurgated Guide, which continued nonetheless to state that instructional materials on genocide and human rights issues should contain "differing points of view on controversial issues." Upon information and belief, the Defendants excised the contra-genocide websites without questioning their educational suitability. Indeed, the Defendants apparently did

not even read the websites before deleting them.  The Defendants evidently were driven solely by political, not educational, concerns.  That the Defendants acted without educational concerns in mind, and likely without even reading the websites in question, is demonstrated by their deletion of the website for the Institute for Turkish Studies, which at all times contained no materials addressing the fate of the Ottoman Armenians.  It therefore appears that the Department of Education's decision-making process in the spring and summer of 1999 was motivated by a generalized political phobia concerning anything "Turkish."

The Defendants maintained in an August 1999 letter that Chapter 276 prohibited inclusion of any information or resources that questioned the genocide thesis.  The source of that legal advice was not disclosed.  The Defendants never stated or even insinuated that the excisions were occasioned by educational concerns.  After this lawsuit was filed, Defendant Peyser was quoted in an Associated Press story as saying that the resources and websites suggested by the Turkish-American Cultural Society of New England ("TACS-NE") "are not academic sites."  (See Exhibit 19.)  Defendant Peyser was further quoted as follows: "If there were intelligent, credible works of history that provide independent and academically sound treatment of these events that did not necessarily characterize them as genocide, I would certainly be willing to include them in the guidelines, but I haven't received any such material at this point, and the Web sites don't qualify."  Id.  Defendant Peyser never communicated this view to TACS-NE or any other person prior to this lawsuit, and those views flatly contradict Defendant Peyser's August 1999 assertion that Chapter 276 categorically prohibits contra-genocide viewpoints.  In addition, Defendant Peyser's claim that "Web sites don't qualify" because of an insinuated lack of academic rigor is belied by the Guide's retention of websites

affiliated with Armenian-American and other organizations that espouse the genocide thesis. (See Exhibit 17.)

The Plaintiffs support the general goals of the statute requiring the formulation of recommendations for the study of genocide and human rights issues. But they believe that historical truth and understanding "are best served by allowing uninhibited and open inquiry and debate,"[4] and they seek relief from the Defendants' violation of their rights to freedom of speech. Regardless of whether the Defendants are correct that Chapter 276 bars the inclusion of the excised contra-genocide materials that they themselves approved for inclusion in the Guide, their decision to expunge those materials from the Guide for political, not educational reasons, contravenes the First and Fourteenth Amendments to the United States Constitution. Only a ruling that requires the Defendants to restore the contra-genocide materials that the Defendants themselves deemed educationally suitable before deleting them from the Guide for political, non-educational reasons can provide full protection of the Plaintiffs' constitutional rights.

## II. JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action because it raises claims under the United States Constitution and 28 U.S.C. § 1983, and the action alleges that the Plaintiffs' federal constitutional rights have been violated by the Defendants acting under color of state law.

2.    Personal jurisdiction over the Defendants named in this action is proper because the Defendants are located in the District of Massachusetts, and the cause of action arose in

---

[4] Letter from James J. Sheehan on behalf of the American Historical Association to the Prime Minister of Turkey (http://www.historians.org/perspectives/issues/2005/0509/0509aha4.cfm).

6

Massachusetts. All Plaintiffs reside in Massachusetts except the Assembly of Turkish American Associations, which has a component association that is based in Massachusetts.

## III. PARTIES

A. <u>PLAINTIFFS</u>

3. Plaintiff Theodore Griswold is a June 2006 graduate of Lincoln-Sudbury Regional High School, a public secondary school in Sudbury, Massachusetts. Thomas Griswold is a resident of Sudbury, Massachusetts, and the parent and next friend of Theodore Griswold.

3a. Plaintiff Jennifer Wright is a secondary school student currently attending Lincoln-Sudbury Regional High School, a public secondary school in Sudbury, Massachusetts. Raymond Wright is a resident of Sudbury, Massachusetts, and the parent and next friend of Jennifer Wright.

3b. Plaintiff Daniel Glanz is a secondary school student currently attending Lincoln-Sudbury Regional High School, a public secondary school in Sudbury, Massachusetts. Richard Glanz is a resident of Lincoln, Massachusetts, and the parent and next friend of Daniel Glanz.

4. Plaintiff William Schechter is a secondary school teacher of social studies at Lincoln-Sudbury Regional High School, a public school in Sudbury, Massachusetts. He has taught plaintiffs Theodore Griswold and Jennifer Wright.

5. Plaintiff Lawrence Aaronson is a secondary school teacher of social studies at Cambridge Rindge & Latin School, a public school in Cambridge, Massachusetts.

6. Plaintiff Assembly of Turkish American Associations ("ATAA") is a District of Columbia non-profit corporation. The ATAA was established in 1979 to promote the interests

of Turkish Americans in the United States. Among its goals is to ensure a balanced and accurate portrayal of Turkey and Turkish Americans in government, the media, and the public at large. The ATAA includes individual members as well as 60 component associations from across North America. One of its component associations is the Turkish American Cultural Society of New England ("TACS-NE"), which is based in Boston, Massachusetts.

7.     Each of the Plaintiffs believes that education in Massachusetts on genocide and human-rights issues is impaired and that they are restrained from proper teaching and learning if viewpoints deemed educationally sound by Massachusetts educational officials are censored for political or other non-educational, illegitimate reasons.

B.     <u>DEFENDANTS</u>

<u>Massachusetts Board of Education</u>

8.     Defendant Massachusetts Board of Education (sometimes "Board") is a public body created pursuant to M.G.L.c. 15, § 1E, and consists of the Chairman of the Student Advisory Council, the Chancellor of Higher Education, one representative of a labor organization selected by the governor from a list of three nominees provided by the Massachusetts State Labor Council, AFL-CIO, one representative of business or industry selected by the Governor with a demonstrated commitment to education, and five additional members selected by the Governor. The Chairperson of the Board is appointed by the Governor.

9.     The Board is the chief policy-making and coordinating body of public education in Massachusetts. Its principal place of business is 350 Main Street, Malden, Massachusetts. It is comprised of nine members who are responsible for its operation, supervision and control.

10.     The Board has general power to determine, adopt, and prescribe policies, rules, regulations, and standards required by law, as well as others the Board deems necessary to improve the state public education system.  The Board is also empowered to establish policies concerning the education of public-school students in early childhood, elementary, secondary and vocational-technical-educational schools.

11.     Pursuant to M.G.L.c. 15, § 1F, the Board, by a two-thirds vote of all its members, appoints a Commissioner of Education ("Commissioner"), who serves as the secretary to the Board, its chief-executive officer, and the chief state-school officer for elementary and secondary education.

Massachusetts Department of Education

12.     Pursuant to M.G.L.c. 15, § 1, the Massachusetts Department of Education ("Department") is under the supervision and control of the Board.  The Department is divided into organizational units, including School Accountability/Targeted Assistance, Curriculum and Instruction, Educator Quality, School Finance and District Support, Student Assessment and Accountability and Special Programs and Services.  The Department, with the Commissioner of Education as chief-executive officer, is the state-education agency charged with assuring implementation of pertinent federal and state laws.

Individual Defendants

13.     Defendant David P. Driscoll is and was at all times relevant to this action the Commissioner of Education of the Massachusetts Department of Education, 350 Main Street, Malden, Massachusetts 02148 ("Commissioner").  Commissioner Driscoll is also the secretary to the Board.  Commissioner Driscoll, as chief-executive officer of the Board, is responsible for

executing the policies adopted by the Board.

14.     Defendant James A. Peyser is and was at all relevant times Chairman of the Board.

## IV.  FACTS

15.     On or about August 10, 1998, Chapter 276 of the Session Laws of 1998 was

approved by the Massachusetts General Court.  Chapter 276 states:

> The board of education shall formulate recommendations on curricular materials
> on genocide and human rights issues, and guidelines for the teaching of such
> material. Said material and guidelines may include, but shall not be limited to, the
> period of the transatlantic slave trade and the middle passage, the great hunger
> period in Ireland, <u>the Armenian genocide</u>, the holocaust and the Mussolini fascist
> regime and other <u>recognized</u> human rights violations and genocides.  In
> formulating these recommendations, the board shall consult with practicing
> teachers, principals, superintendents, and curricular coordinators in the
> commonwealth, as well as experts knowledgeable in genocide and human rights
> issues.  Said recommendations shall be available to all school districts in the
> commonwealth on an advisory basis, and shall be filed with the clerk of the
> House of Representatives, the clerk of the Senate, and the House and Senate
> chairmen of the joint committee on education, arts, and humanities not later than
> March 1, 1999. [emphasis supplied]

16.     Pursuant to Chapter 276, on January 15, 1999, Commissioner Driscoll circulated

a non-final draft of "The Massachusetts Guide to Choosing and Using Curricular Materials on

Genocide and Human Rights" ("the Guide") to members of the Board for their review and

comments.  (<u>See</u> Exhibit 1.)  The draft Guide contained citations to resource materials on

genocide and human rights issues "to be used in conjunction with the Massachusetts Curriculum

Frameworks, in particular those for History and Social Science and English Language Arts, both

published in 1997."  <u>Id.</u> at 2.  More specifically, the draft Guide referred to "the Armenian

genocide," and contained references to resources for teaching genocide and human-rights issues,

including the (1) Armenian Studies and Research National Association, (2) Armenian National

Institute, and (3) selected texts on "Armenian Studies." Id. at 4, 23-27. The draft Guide also contained a number of appendices that reproduced excerpts from various documents including the Bill of Rights of the United States Constitution, the United Nations Universal Declaration of Human Rights, and the Convention on the Rights of the Child. Id. at 29-37. Appendix D of the draft Guide was entitled "Definitions of Genocide." Id. at 38. Appendix D discussed the history of the word "genocide" and the manner in which the United Nations used the term in its 1948 Convention on the Prevention and Punishment of the Crime of Genocide ("1948 U.N. Genocide Convention"). Appendix E, entitled "Background Information on Human Rights Violations and Genocides," gave historical summaries of each issue mentioned in Chapter 276. Id. at 39-40. The summary argued that the "Muslim Turkish Ottoman Empire" was responsible for the deaths of large portions of the Armenian population of the Ottoman Empire around the time of World War One. Id. No resources that mentioned the contra-genocide perspective on this period in history were included in the draft Guide, even though the Guide stated that one of its standards for selecting instructional materials on genocide and human rights issues was to provide "differing points of view on controversial issues." Id. at 21.

17.     On January 19, 1999, the Turkish American Cultural Society of New England ("TACS-NE") wrote to Commissioner Driscoll to request that the draft Guide present "an objective study of history," and to urge that the Guide include the contra-genocide perspective, using resources such as TACS-NE itself, along with studies by certain respected professors at American universities. (See Exhibit 2.)

18.     As part of the ongoing administrative process, on January 26, 1999, the Board held a public meeting to help evaluate potential additional materials for inclusion in the Guide.

TACS-NE made a presentation to the Board in which it asked for all perspectives concerning the fate of the Ottoman Armenians to be studied, utilizing materials expressing different but educationally suitable points of view. Other parties made presentations on historical events of particular interest to them. For example, proponents of the view that the Soviet government caused a genocide in the Ukraine in 1932-33 made a presentation. The Government of Turkey made no presentation. The Board voted to adopt the draft Guide, as presented, with certain alterations.

19.     In a letter to TACS-NE President Erkut Gomulu, dated January 27, 1999, Commissioner Driscoll thanked the organization for its correspondence and presentation of January 26. The Commissioner wrote that "the Board is sensitive to the complexity of the issues contained in the [Guide]." (See Exhibit 3.) Commissioner Driscoll stated that the Board intended to demonstrate its sensitivity to the Armenian-Turkish issue, writing that "[i]n approving the [Guide], the Board has directed the Department to delete Appendices D and E in the draft . . ." Id.

20.     In his January 27, 1999 letter to TACS-NE, Commissioner Driscoll also volunteered – without prompting or lobbying by the Government of Turkey or otherwise – that "I encourage you to submit bibliographic references that your group [TACS-NE] recommends be added to the resource section," and directed that such materials be submitted to Susan Wheltle, head of Instruction and Curriculum Services. Id. Ms. Wheltle subsequently contacted TACS-NE and was given the name of Professor Justin McCarthy at the University of Louisville as a resource. Ms. Wheltle e-mailed Professor McCarthy, requesting any helpful bibliographic materials for inclusion in the Guide before its finalization and submission to the Massachusetts

legislature by March 1, 1999, as required by Chapter 276. (See Exhibit 5.)

21.     On February 5, 1999, State Senator Steven A. Tolman, a politician, not an educator, wrote to then-Chairman of the Board Dr. John Silber, suggesting the "reintroduction" of Appendices D and E as "an important frame of reference for both teachers and students..." (See Exhibit 4.)  Senator Tolman further stated that, "[a]lthough some editing of appendices D and E might be appropriate, I feel that their removal severely diminishes the overall effectiveness of this Guide." *Id.*  Appendices D and E were not, however, included in the final version of the Guide.

22.     On February 8, 1999, TACS-NE sent a letter to Ms. Wheltle, expressing "deep dismay" that the draft Guide had accepted the characterization of the Ottoman Armenian experience as genocide. (See Exhibit 6.)  TACS-NE suggested that the Guide use the language "Armenian question" in the place of "Armenian genocide." Id.  The letter stated that the materials were "one-sided" and would cast undeserved guilt on students of Turkish descent in the classrooms. Id.  It proposed ten books, three websites, and the contact information of three Turkish organizations for inclusion in the Guide, along with the Armenian resource materials already included in the draft Guide, in keeping with the Guide's directive to include multiple viewpoints on controversial issues. Id.

23.     On February 19, 1999, Ms. Wheltle sent an e-mail to Mr. Gomulu, thanking him for the materials he sent her. (See Exhibit 7.)  She informed him that the Department of Education "plan[s] to include the organizations and websites that [he] suggested in the Guide, so that teachers and high school students will have access to the many bibliographies and other resources on history and current events they offer." Id.  Ms. Wheltle also stated, however, that

the Department was not prepared to alter its use of the phrase "the Armenian genocides" at p. 48

of the Massachusetts History and Social Science Curricular Framework (adopted by the Board in

June 1997) and its use of the same expression (in the singular form "the Armenian Genocide") at

p. 4 of the draft Guide. Thus, Ms. Wheltle wrote that she had "discussed the recommendations

[Mr. Gomulu had] made for revising the language in the [History and Social Science Curricular]

framework with several people who were involved in writing it[,]" but that the "history and

social science framework simply cannot be changed immediately." See Exhibit 7. Ms. Wheltle

noted that the History and Social Science Curricular Framework, "like all the rest, will undergo a

review process, most probably 2 years from now." Id. In sum, the Department of Education

refused to accept all of the TACS-NE recommendations, but instead made an independent

educational judgment to include in the draft Guide only four websites reflecting the contra-

genocide thesis. These four websites were among the materials recommended by TACS-NE.

The books recommended by TACS-NE were not included in the Guide. The use of the phrase

"Armenian genocide" in the text of the draft Guide and in the History and Social Science

Curricular Framework remained unaffected by the Department's decision to incorporate the four

suggested contra-genocide websites.

24.     On March 1, 1999, Commissioner Driscoll submitted to the Massachusetts

Legislature the final version of the Guide, as required by Chapter 276. In his accompanying

cover letter, Commissioner Driscoll stated that "[i]n accordance with Chapter 276 of the Acts of

1998, I am submitting the enclosed *Guide to Choosing and Using Curricular Materials on*

*Genocide and Human Rights*." Commissioner Driscoll further stated that "[t]he Board of

Education has reviewed the document, and voted to accept it at its meeting on January 26,

1999." Commissioner Driscoll's letter also stated that "the Department will design, print, and distribute copies of this *Guide* to all schools this spring." (See Exhibit 8.) In its list of "Resources for Teaching about Genocide and Human Rights Issues," the Guide included the websites of TACS-NE, the Institute for Turkish Studies at Georgetown University ("ITS"), Plaintiff Assembly of Turkish American Associations ("ATAA"), and the Turkish Embassy. Id. at 25-26, 28. The Guide also included four Armenian-related websites: the Armenian Studies and Research Association, the Armenian National Institute, the Armenian Embassy, and the Armenian Research Center at the University of Michigan at Dearborn. Id. at 24, 26, 28. The Guide did not mandate that teachers make use of any of these resources, but rather made reference to them as non-textbook, non-classroom materials that teachers and students were free to consult along with whatever books, journals, and films might be available in their school libraries or elsewhere. Id. at 21. Thus, the final Guide, as submitted to the Legislature, and based solely on educational criteria, contained resource materials from both perspectives concerning whether the fate of the Ottoman Armenians could fairly be characterized as a genocide, the crime defined in the 1948 U.N. Genocide Convention. But then politics and politicians intervened.

25. On June 12, 1999, four regional committees of the Armenian National Committee of America (hereinafter, the "ANC") – none of which is an educational or historical organization versed in the history of the late Ottoman Empire – issued a press release along with a letter to Governor Paul Cellucci of Massachusetts, urging that only one point of view, that favored by advocates of the genocide thesis, be represented in the Guide. They declared that the "ANC urges Governor Cellucci to remove racist resources from [the] genocide curriculum . . . . The

15

curriculum guide cites a number of organizations, including addresses and websites, as resources for teaching about genocide and human rights issues.  Some of these organizations, however, have been engaged in a disgraceful denial of mass murder and genocide over the years.  These organizations are: 1) Turkish Embassy in Washington DC; 2) Institute for Turkish Studies, Georgetown University, Washington DC; 3) Assembly of Turkish American Associations, Washington, DC; and 4) Turkish American Cultural Association of New England, Boston, MA. Inclusion of genocide denial is directly counter to the intent of the Law . . . . Careless intermingling of genocide denial with the documentary sources it aims to obscure will only serve to confuse students and undermine academic integrity.  Thus we strongly recommend that the above listed organizations not be considered as primary sources for educational material on human rights and genocide and that they be removed from the list of sources."  (See Exhibit 9.)

26.     The ANC, in its letter to Governor Cellucci, further stated that "[t]he Turkish government has consistently been cited for its poor human rights record by such organizations as Amnesty International and the US State Department," and that, "[m]oreover, the Turkish government has consistently denied its role in the genocide of the Armenians despite the abundant documentation in the US State Department archives and the archives of numerous other nations."  Id.  In addition, the ANC pointed out that, "while referencing web sites for source material is both convenient and useful, it is also risky.  Generally website articles are not peer reviewed.  As genocide education progresses web site articles can be quickly changed or added to facilitate the denial of the Armenian genocide.  We strongly recommend that no web site be referenced in which any government with a poor human rights record may have a say over the website's content.  This certainly includes the [Turkish] web sites listed above."  Id.

27.     In June 1999, Commissioner Driscoll further revised what was supposed to have been, in accordance with Chapter 276, the final Guide that had been submitted to the Legislature on March 1, 1999.  Commissioner Driscoll revised the Guide to excise all references to Turkish websites, except for the reference to the website for the Turkish Embassy in Washington, D.C. (See Exhibit 10.)  The Commissioner expressed no concerns over the educational suitability of the excised websites.  He acted in response to political pressure brought by the ANC, Senator Tolman, and Governor Cellucci.  The lack of any connection between Commissioner Driscoll's excisions and educational concerns was demonstrated by the fact that the website for the Institute for Turkish Studies, on information and belief, did not address the Armenian genocide issue in June 1999 or at any time before or after.  The website for the Institute for Turkish Studies was thus deleted obviously in order to appease the political opposition to anything appearing to be "Turkish."  Despite the deletions of materials reflecting one side of the controversy laid out in the earlier "final" version of the Guide, the now-expurgated version of the Guide continued to state that instructional materials on genocide and human rights issues should provide "differing points of view on controversial issues."  Id. at 20.  Defendant Peyser's statement to the Associated Press that he would be willing to include in the Guide intelligent, credible works of history that propound contra-genocide viewpoints, see Exhibit 19,  is false.

28.     On August 10, 1999, Bonnie Joy Kaslan, Member of the Board of Trustees of the ATAA, and Chairman of the ATAA's Curriculum Committee on History and Social Science, wrote to Commissioner Driscoll to protest the removal of the Turkish websites from the Guide. (See Exhibit 11.)  Ms. Kaslan strongly criticized the decision to remove these resource materials from the Guide, noting that it failed to adhere to the objective to present a "balanced study of

history," and that the decision "appear[ed]" to be the result of "pressure from ethnically interested legislators . . . . " <u>Id.</u> Ms. Kaslan further stated that "[p]assing politically disposed resolutions is not an appropriate nor academic reason to state that events that so impacted present day Americans from the now defunct Ottoman Empire shall only be represented (or will have the majority of material) by those who claim one perspective, theirs alone." <u>Id.</u> She urged the Board to "do what was the right decision originally, that is do not take sides against one or another of your constituents. Treat them and their stories with respect, allow students to hear and learn for themselves the complexities and tragedies of nations that are manifested in the lives of ordinary human beings. By doing so, you would be honoring your own professed statements of presenting history through a balanced study of events. After all, this should be about the welfare and education of the children of your state, of this nation, 'with malice towards none.'" <u>Id.</u>

29.     On August 16, 1999, TACS-NE sent a letter to Commissioner Driscoll and to the members of the Board. (<u>See</u> Exhibit 12.) Like the ATAA, TACS-NE also protested the removal of the Turkish websites, stating that "[i]f one-sided materials are taught every student will suffer from an impoverished understanding of genocide issues and human rights no matter what race, religion, ethnicity, or background. Ignorance is never good pedagogy." TACS-NE also sent a letter to Governor Cellucci on the same day, stating that "[d]elisting of these web sites wars with the First Amendment. . . We would like to appeal the decision of Commissioner Driscoll and kindly request an official explanation to this intolerable degree of ethnically oriented political intrusion to the field of education." (<u>See</u> Exhibit 13.)

30.     On August 31, 1999, Commissioner Driscoll and the Chairman of the Board,

James E. Peyser, wrote back to the ATAA and TACS-NE. (See Exhibit 14.) Their letter quoted Chapter 276 in its entirety, all in italics. Id. The letter stated that "[s]ince the legislative intent of the statute was to address the Armenian genocide (emphasis added) and not to debate whether or not this occurred, the Board and Department of Education cannot knowingly include resources that call this into question. The explicitness of the statute has also forced us to reverse our earlier decision to include the website listing for the Turkish Embassy." Id. The letter continued, "[t]he Massachusetts Board and Department of Education recognize fully the right of the Turkish community to present its viewpoint on the events of the latter days of the Ottoman Empire. In addition, it should be noted that individual districts are free to develop their own approaches to teaching this historical period. However, the Massachusetts Human Rights Guide, developed under the auspices of Chapter 276, must be in accordance with the language of that statute. Unless that statute is changed, the Massachusetts Human Rights Guide will not knowingly include any references that counter the language of the legislation." Id. Finally, Driscoll and Peyser wrote that they "acknowledge[d] that this is not the outcome you requested in your letter," and suggested that if TACS-NE "wish[ed] to pursue this concern further, we recommend that you do so through state legislative channels." Id.

31.     According to the August 31, 1999 letter to TACS-NE from Commissioner Driscoll and Chairman Peyser, the Defendants excluded materials previously deemed educationally suitable for inclusion in the Guide (and therefore previously included in the Guide) because, in their view, Chapter 276 reflected a political determination to prohibit the inclusion of contra-genocide viewpoints despite their educational suitability. The Massachusetts Department of Education has recently stated that it has no record that any legal opinion on the scope of

Chapter 276 was requested before Commissioner Driscoll and Chairman Peyser sent their August 31, 1999 letter to the ATAA and TACS-NE in which they stated that Chapter 276 required them to remove from the Guide any materials that questioned whether the events that occurred during the waning days of the Ottoman Empire constituted genocide.  (See Exhibit 15).

32.     A later press release, issued by the ANC of Massachusetts on June 26, 2002, boasted about the political pressure that was brought to bear on the Department of Education and the Board to remove from the curricular Guide all materials that declined to articulate the genocide thesis.  The press release reported that the ANC had become aware that recently the Department of Education's Guide had replaced the words "Armenian genocide" with "Armenian slaughter." (See Exhibit 16.)  This modification, the ANC declared, was in violation of Chapter 276, which had used the term "Armenian genocide."  The press release stated that "[a] phone call placed to Commissioner David P. Driscoll by the ANC was met by the claim that the period for 'public comment' on the genocide guidelines was over and that no changes would be made."  Id. However, the press release continued, the ANC "was able to immediately mobilize members of the Armenian-American community as well as members of the Massachusetts legislature to take action."  The press release further stated: "Senator Steven Tolman drafted a letter formally requesting that the Department of Education (sometimes "DOE") 'immediately stop approval of the new history frameworks scheduled for Tuesday, May 28, 2002 at the Board of Education's monthly meeting.'"  Id.

33.     The ANC press release further noted that, "[a]s a result, the newest version of the DOE's curriculum guidelines correctly refers to the 'Armenian genocide.'"  The ANC further stated that "[t]his is not the first attempt by the DOE to circumvent the 1998 law.  In a previous

incident, the DOE Web site included not just references to the Armenian genocide but also links to Turkish hate sites that denied the Armenian genocide. This would be comparable to the DOE's directing citizens to Holocaust-denial and neo-Nazi Web sites. The ANC was instrumental at that time in having the links to the Turkish hate sites removed." Id.

34. The present revised version of the Guide (also referred to herein as the "expurgated Guide") is posted on the Department of Education's website (as of January 26, 2006). The Guide brings together selections from the "Core Knowledge and Commonly Taught Subtopics" section of the Massachusetts History and Social Science Curriculum Framework that pertain to genocide and human rights issues. In its outline of "Commonly Taught Subtopics," under the subheading "[t]he human toll of 20th century wars and genocides; the Holocaust," the Guide lists "[t]he Armenian genocides, mid-1890s and 1915." (See Exhibit 17.)

35. The introductory portion of the expurgated Guide states that "[l]earning about genocide in history and its persistence into the present day is important for today's students. Although most students learn about the Nazi Holocaust, they may regard it as an isolated phenomenon, and do not learn that many such incidents of intentional mass killings have occurred all over the world and throughout history. Genocides in the modern era have often been sanctioned by specific governments and based on ideologies that legitimize prejudice and violence. It is important that students have factual knowledge about these issues, and that they understand how other governments, organizations, and individuals work to preserve and protect human rights." Id.

36. The expurgated Guide, near its end, under the heading "Choosing Instructional Materials and Programs on Genocide and Human Rights Issues," states that, "[a]lthough some

information on genocide and human rights issues is contained in textbooks, teachers wishing to explore these topics in greater depth must find further information from other sources. Organizations that can serve as resources for finding these materials are listed below. Many of them provide extensive and frequently updated bibliographies of reference and trade books, journals, articles, films and further Internet resources." Id.

37.     The expurgated version of the Guide also continues to state, under the heading "Choosing Instructional Materials and Programs on Genocide and Human Rights Issues," that instructional materials on genocide and human rights issues should provide "differing points of view on controversial issues." Id.

38.     The section of the expurgated Guide entitled "The Internet as a Tool for Researching Genocide and Human Rights Issues" states: "[w]hile the Internet has become a valuable tool for research, it is a resource without 'filters.' In the classroom, materials must be evaluated for authenticity, accuracy, and bias. Students need to have tools to analyze the validity of sources they find on the Net, particularly when they research controversial issues and current events." Id. This statement is followed by a series of questions as to how to evaluate a website's information, including who sponsors the site, whether the author is sufficiently credentialed, whether the information is factual and well-written, whether the site is updated, and so on. Id.

39.     Beneath the list of questions is a list of organizations, including the American Civil Liberties Union and various ethnic groups' organizations. These organizations include the Armenian Studies and Research Association of Belmont, MA, and, under the heading "National and International Organizations," the Armenian National Institute and its website, www.armenian-genocide.org, are listed. Listed under the heading "Additional Websites," on the

last page of the expurgated Guide before the Appendices, are other resources, including the Armenian Embassy in Washington D.C. and the Armenian Research Center at the University of Michigan at Dearborn, both with their respective websites: www.armeniaemb.org and www.umd.umich.edu/dept/armenian.  There are no Turkish or Turkey-related websites contained in this list or anywhere else in the expurgated Guide.  Nor are any websites listed that contain contra-genocide or dissenting viewpoints.

40.     On June 27, 2005, Chairman Peyser confirmed via letter the position that he and Commissioner Driscoll took in August 1999, asserting that "[w]e do not . . . interpret Chapter 276 as authorizing the Board to adopt curricular guidelines that call into question whether the various atrocities enumerated in the statute actually occurred."  (See Exhibit 18.)

41.     Chapter 276 was enacted without legislative consultation with expert educators or historians concerning the Armenian genocide thesis.  No expert educator or historian was called to testify at a legislative hearing.  The legislature made no findings that contra-genocide viewpoints were, *ipso facto*, educationally unsuitable.  None of the Defendants was consulted by the legislature in the enactment of Chapter 276 as regards the Armenian genocide thesis.  Nor did Chapter 276, as adopted, reflect on its face a legislative intent to limit the materials to be included in the Guide to those reflecting particular schools of historical thought.  Instead, Chapter 276 instructed the Board of Education to "consult with practicing teachers, principals, superintendents, and curricular coordinators in the commonwealth, as well as experts knowledgeable in genocide and human rights issues."  (See Exhibit 1.)  Upon information and belief, Governor Cellucci and Senator Tolman have never claimed to be "experts knowledgeable in genocide and human rights issues," nor would they be regarded as such by persons who are in

fact "experts knowledgeable in genocide and human rights issues."

42.     At no time did the Board of Education dispute the legality and finality of the Guide when submitted to the Legislature on March 1, 1999 with the inclusion of the later-deleted websites. At no time prior to March 1, 1999 did the Board of Education submit to the Legislature guidelines that did not include the later-deleted websites. The Guide that the Board of Education submitted to the Legislature on March 1, 1999 is the only version of the Guide that satisfied the requirement of Chapter 276 that the Board file its recommendations not later than March 1, 1999.

43.     Commissioner Driscoll's revised and expurgated Guide was never voted on by the Board of Education. Commissioner Driscoll deleted the contra-genocide websites with no input from educational experts or historians despite Chapter 276's instruction that they should be consulted.

44.     Plaintiff Thomas Griswold is the parent and next friend of Theodore Griswold, a June 2006 graduate of Lincoln-Sudbury High School. Plaintiffs Thomas and Theodore Griswold are aware of the events and occurrences alleged in ¶¶ 15-43 herein. As a result of the Defendants' conduct, they believe that Theodore may have been denied the opportunity to receive contra-genocide viewpoints in school that they believe were necessary to enable Theodore to arrive at an informed understanding of the historical events in question and that the Defendants have deemed educationally suitable. Plaintiffs Thomas and Theodore Griswold believe that the deletion of the contra-genocide materials from the Guide for political, non-educational reasons infringed upon Theodore's federal constitutional rights to inquire and learn free from viewpoint discrimination unrelated to educational suitability.

44a.    Plaintiff Raymond Wright is the parent and next friend of Jennifer Wright, a student at Lincoln-Sudbury High School.  Plaintiffs Raymond and Jennifer Wright are aware of the events and occurrences alleged in ¶¶ 15-43 herein.  As a result of the Defendants' conduct, they believe that Jennifer and other similarly situated students may be denied the opportunity to receive contra-genocide viewpoints in school that they believe are necessary to enable Jennifer to arrive at an informed understanding of the historical events in question and that the Defendants have deemed educationally suitable.  Plaintiffs Raymond and Jennifer Wright believe that the deletion of the contra-genocide materials from the Guide for political, non-educational reasons infringes upon Jennifer's and other similarly situated students' federal constitutional rights to inquire and learn free from viewpoint discrimination unrelated to educational suitability.

44b.    Plaintiff Richard Glanz is the parent and next friend of Daniel Glanz, a student at Lincoln-Sudbury High School.  Plaintiffs Richard and Daniel Glanz are aware of the events and occurrences alleged in ¶¶ 15-43 herein.  As a result of the Defendants' conduct, they believe that Daniel and other similarly situated students may be denied the opportunity to receive contra-genocide viewpoints in school that they believe are necessary to enable Daniel to arrive at an informed understanding of the historical events in question and that the Defendants have deemed educationally suitable.  Plaintiffs Richard and Daniel Glanz believe that the deletion of the contra-genocide materials from the Guide for political, non-educational reasons infringes upon Daniel's and other similarly situated students' federal constitutional rights to inquire and learn free from viewpoint discrimination unrelated to educational suitability.

45.    Plaintiff William Schechter is a social studies and history instructor at Lincoln-Sudbury High School, a public school in Sudbury, Massachusetts, where plaintiffs Jennifer Wright and

Daniel Glanz are students and from which plaintiff Theodore Griswold graduated in June 2006. Plaintiff Schechter has taught social studies and history at the high school level for thirty-three years. The curriculum he teaches includes human and civil rights controversies and topics.

46. Plaintiff Schechter is aware of the occurrences alleged in ¶¶ 15-43 herein. When Plaintiff Schechter teaches history to his students, he often presents them with conflicting points of view among legitimate historians. Rather than seeking to instruct his students as to the correctness of a particular point of view, he teaches his students the techniques for evaluating historical facts and resource materials in an intellectually critical manner and then urges his students to reach their own conclusions. Like Defendants, he understands and believes that there is a genuine and continuing academic and historical controversy concerning whether the tragic experience of the Ottoman Armenians constitutes the crime of genocide. Like Defendants, he regards the contra-genocide viewpoint on the events in question to be sufficiently intellectually respectable that materials presenting that viewpoint should be available to public-school students and teachers alike. Mr. Schechter believes that the Defendants' decision to exclude the contra-genocide materials from the Guide for political, non-educational reasons teaches the wrong lesson: that historical right and wrong should be decided by censorship and state orthodoxy rather than by research and reasoned argument, whether inside or outside the classroom. He also believes that the Defendants' excision, for political reasons, of the contra-genocide materials that they themselves determined were educationally suitable infringes upon the federal constitutional rights of teachers and students to inquire, teach and learn free from viewpoint discrimination unrelated to educational suitability.

47. Plaintiff Lawrence Aaronson has taught social studies, history and civil rights for twenty-

seven years at Cambridge Rindge & Latin School, a public high school in Cambridge, Massachusetts. Plaintiff Aaronson is aware of the occurrences alleged in ¶¶ 15-43 herein.

48.     Like Plaintiff Schechter, Plaintiff Aaronson believes that teaching history involves presenting students with conflicting points of view among legitimate historians of a given subject and then teaching them how to use the appropriate critical intellectual and academic tools for assessing those conflicting points of view. Plaintiff Aaronson believes that the suppression of the contra-genocide materials from the Guide constitutes viewpoint discrimination unrelated to educational suitability, on what is a contested issue of historical interpretation. He believes that the Defendants' deletion, for political, non-educational reasons, of the contra-genocide materials that they themselves deemed educationally suitable violates free expression and academic freedom and infringes upon the federal constitutional rights of teachers and students to inquire, teach and learn.

49.     Plaintiff Assembly of Turkish American Associations ("ATAA") has an interest in promoting public education and awareness about Turkey and issues that concern Turkish Americans. ATAA is the author of one of the excised websites and is aware of the occurrences alleged in ¶¶ 15-43 herein. Plaintiff ATAA and its members are concerned that students in Massachusetts public schools are being taught a one-sided view of controversial and controverted historical events that stigmatizes Turkish Americans and their ancestors, notwithstanding the fact that the legal and historical characterization of the fate of the Ottoman Armenians during the First World War is disputed by eminent and respected historians. The ATAA and its members are concerned that this censorship prejudices Turkish Americans in general and stunts education by suppressing educationally suitable materials that were initially

selected for inclusion by the Department's educational experts but then excised under political pressure.

## COUNT ONE (Federal Civil Rights Act, 42 U.S.C. § 1983; First and Fourteenth Amendments, United States Constitution)

50.     Plaintiffs incorporate by reference the allegations in ¶¶ 15-49 of this complaint.

51.     The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law."  Among the rights and liberties guaranteed by the Fourteenth Amendment is the First Amendment's guarantee of freedom of speech and expression, which prohibits the government from expunging viewpoints thought to be politically unpopular.

52.     The acts and occurrences alleged in ¶¶ 15-43 of the complaint abridge the Plaintiffs' constitutional right to enjoy the opportunity to receive speech without viewpoint discrimination practiced by the government to further a political agenda unrelated to educational suitability as determined by the government itself.

53.     Defendants, singly and collectively, have acted and continue to act under color of Massachusetts state law to violate the Plaintiffs' First and Fourteenth Amendment rights, by deleting educationally suitable contra-genocide viewpoints from the Guide to further a political agenda.

## COUNT TWO (Federal Civil Rights Act, 42 U.S.C. § 1983; First and Fourteenth Amendments, United States Constitution)

54.     Plaintiff ATAA incorporates by reference the allegations in ¶¶ 15-49 of this

complaint.

55.     The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law."  Among the rights and liberties guaranteed by the Fourteenth Amendment is the First Amendment's guarantee of freedom of speech and expression, which prohibits the government from engaging in the suppression of viewpoints thought to be politically unpopular that the government itself has determined to be educationally suitable.

56.     Plaintiff ATAA enjoyed a constitutional right to not have its website excised to further a political agenda despite the Defendants' belief in the educational suitability of the ATAA website.

57.     The Defendants' deletion of the ATAA website violated the equal protection component of ATAA's First Amendment right to freedom of speech.

## PRAYER FOR RELIEF

58.     Wherefore, Plaintiffs respectfully request that this Court:

a.     Find and declare that Defendants, individually and collectively, by engaging in the actions and occurrences alleged in this complaint, have violated and continue to violate the First and Fourteenth Amendment rights of the Plaintiffs protected by the United States Constitution and 42 U.S.C. § 1983.

b.     Issue an injunction requiring the Defendants to restore to the Guide all expunged contra-genocide materials.

c.      Retain jurisdiction until the Defendants have remedied the constitutional violations specified in its declaration.

d.      Award reasonable attorney's fees and costs, as provided in 42 U.S.C. § 1988, and such other relief as may be just.

Plaintiffs demand a jury trial on all counts so triable.

Respectfully submitted,


/s/ Norman S. Zalkind                                    /s/ Harvey Silverglate
/s/ Malick W. Ghachem                                   Harvey Silverglate (BBO #462640)
Norman S. Zalkind (BBO# 53880)                          607 Franklin St.
Malick W. Ghachem (BBO #661018)                         Cambridge, MA 02139
Zalkind, Rodriguez, Lunt & Duncan LLP                   Tel: 617-661-9156
65a Atlantic Ave.                                       Fax: 617-492-4925
Boston, MA 02110                                        has@harveysilverglate.com
Tel: 617-742-6020
Fax: 617-742-3269
nzalkind@zrld.com
mghachem@zrld.com                                       /s/ Philip G. Cormier
                                                        Philip G. Cormier (BBO # 554515)
                                                        Good & Cormier
                                                        83 Atlantic Ave.
                                                        Boston, MA 02110
                                                        Tel: 617-523-5933
                                                        Fax: 617-523-7554
                                                        pcormier@goodcormier.com


Dated: August 31, 2006

## Certificate of Service

I hereby certify that on this 31st day of August 2006, a true copy of the foregoing document (without exhibits) was served electronically, and a true copy (with exhibits) was served by U.S. mail, upon all registered participants presently listed as attorneys of record on the CM/ECF notice.

/s/ Malick W. Ghachem
Malick W. Ghachem
BBO #661018
Tel: 617-742-6020